**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| H.R. and A.R., *individually and on behalf of S.R., a minor child*,<br><br>Plaintiffs,<br><br>v.<br><br>WEST WINDSOR-PLAINSBORO BOARD OF EDUCATION,<br><br>Defendant. | Civil Action No. 22-3103 (MAS) (JBD)<br><br>**MEMORANDUM OPINION** |

**SHIPP, District Judge**

This matter comes before the Court upon Defendant West Windsor-Plainsboro Board of Education's ("Defendant") Motion for Summary Judgment (ECF No. 8) and Plaintiffs H.R. and A.R.'s, individually and on behalf of S.R.'s ("Plaintiffs"), Motion for Summary Judgment (ECF No. 9). Both parties filed oppositions (ECF Nos. 11, 12), but neither party replied. After careful consideration of the parties' submissions, the Court decides the parties' motions without oral argument pursuant to Local Civil Rule 78.1. For the reasons outlined below, Defendant's motion is granted in its entirety, and Plaintiffs' motion is denied.

## I.     **BACKGROUND**

### A.     **Overview of the Individuals with Disabilities Education Act ("IDEA")**

Through the IDEA, the federal government provides funding to assist states with educating disabled children living within their borders. *See* 20 U.S.C. §§ 1400, *et. seq.*; *see also Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 267 (3d Cir. 2014). States receiving these funds must

adopt a set of policies and procedures meant to guarantee all disabled children receive a free appropriate public education ("FAPE"). 20 U.S.C. §§ 1412(a), 1413(a); *see also Blunt*, 767 F.3d at 267-68. If a child is deemed to have a disability, then a state satisfies its duty to provide a FAPE by providing "an [Individualized Education Program ('IEP')], which is 'an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.'" *J.M. v. Summit City Bd. of Educ.*, No. 19-159, 2020 WL 6281719, at *1 (D.N.J. Oct. 27, 2020) (quoting *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 403 (2017)), *aff'd*, 39 F.4th 126 (3d Cir. 2022). "If parents are dissatisfied with the district's determinations or IEP, they may bring a challenge in a state administrative process and then seek review in court." *Id.*

## B.   Factual Background

Plaintiffs are the parents of S.R., a minor child who in January 2019, at age four, was diagnosed with Attention-Deficit Hyperactivity Disorder ("ADHD"). (*See* Pls.' Statement of Undisputed Material Facts ("PSUMF") ¶ 1, ECF No. 9-1; Def.'s Statement of Facts ("DSF") ¶ 452, ECF No. 8-2; Administrative Law Judge ("ALJ") Op. 2, ECF No. 1-1; Ex. 7 to Administrative R. ("AR") *4, *36[1], ECF No. 16-7.) In April 2019, while S.R. was in preschool, he was assessed and deemed eligible for "special education and related services under the category of 'preschool child with a disability.'" (ALJ Op. 3; *see also* PSUMF ¶ 8; DSF ¶ 421.) To that end, S.R. was placed on an IEP from April 15, 2019 to April 14, 2020 that included goals "related to his ADHD." (ALJ Op. 3, PSUMF ¶¶ 8-9; Def.'s Response to Pls.' Statement of Undisputed Material Facts ("DRPSUMF") ¶¶ 8-9, ECF No. 11-1.)

---

[1] When citing to the record, all pages numbers preceded by an asterisk refer to the page number listed in the ECF header at the top of the page.

In March 2019, S.R. underwent psychological assessments. (ALJ Op. 15; PSUMF ¶¶ 6-8; *see also* DSF ¶¶ 248-54.) S.R.'s intelligence quotient ("IQ") was measured at 124 (the 95th percentile for his age), his verbal intelligence was measured as above average, and his nonverbal intelligence was measured as moderately above average. (ALJ Op. 10, 25; PSUMF ¶ 7, DSF ¶ 433.) In May 2020, however, S.R. registered a 73 on the Woodcock-Johnson IV Tests of Early Cognitive and Academic Development ("ECAD"), which placed S.R. in the 3rd percentile for letter-word identification. (PSUMF ¶ 30; DRPSUMF ¶ 30.) Moreover, on the Young Children's Achievement Test-Second Edition (YCAT-2), S.R. scored a 6 in General Information and 7 in Reading, both below average scores. (PSUMF ¶¶ 32-33, DRPSUMF ¶¶ 32-33.)

Thereafter, Defendant offered Plaintiffs another IEP for S.R. (ALJ Op. 3; *see also* PSUMF ¶¶ 11-12; DSF ¶ 28.) In doing so, the "IEP team" determined S.R. "continued to have 'a disability as defined in N.J.A.C. 6A:14-3.5 or 3.6[,] which adversely affects [his] educational performance.'" (PSUMF ¶ 12 (second alteration in original); DRPSUMF ¶ 12.) In deciding S.R. should be offered an IEP, his preschool case manager Katie Pollard ("Pollard") and a child-study team "met with [Plaintiffs] to discuss S.R.'s performance in preschool and the plan for kindergarten." (DSF ¶¶ 48, 67, 89; Pls.' Response to Def.'s Statement of Facts ("PRDSF") ¶ 67, ECF No. 12-1.) The May 2020 IEP reported on progress S.R. made in his previous IEP and added modifications to include "cueing for off-task behavior, discussing behavior issues privately[, and] presenting alternatives to negative behavior." (PSUMF ¶¶ 11-13; DRPSUMF ¶¶ 11-12.)

In the summer of 2020, Defendant administered a reevaluation of S.R., which, Defendant maintains, was only required because the emergence of Covid-19 in the spring of 2020 prevented a proper pre-kindergarten evaluation. (*See* PSUMF ¶ 15; DSF ¶ 24.) As part of the reevaluation, Defendant psychologist Amanda Goodstein M.A., NCSP ("Goodstein") and Defendant Learning

Consultant Marissa Farber ("Farber") prepared a Social Emotional Update. (PSUMF ¶ 16, DRPSUMF ¶ 16.) The Social Emotional Update included Farber's reports from both in-person and virtual classroom observations of S.R. (PSUMF ¶ 20; DRPSUMF ¶ 20.) The Social Emotional Update also included "'[r]eporting on [S.R.'s] 'Social/Emotional and Adaptive Functioning,'" which in part summarized Plaintiffs' August 2020 responses to a Behavioral Assessment System for Children-3 questionnaire ("BASC-3"). (PSUMF ¶ 24; DRPSUMF ¶ 24.) Plaintiffs' BASC-3 raised concerns over S.R.'s "attention, hyperactivity[,] and aggression" as well as "his adaptability, social skills[,] and activities of daily living." (PSUMF ¶¶ 24-27; DRPSUMF ¶¶ 24-27; *see also* DSF ¶¶ 104-05.) Separately, Farber reviewed a confidential Education Evaluation for S.R., prepared by Pollard. (DSF ¶ 89; PRDSF ¶ 89.) The Education Evaluation was comprised of S.R.'s previous testing, which contained in part the 51-point discrepancy between S.R.'s IQ and ECAD scores. (*See* ALJ Op. 9-10, 15, 21; PSUMF ¶ 31; DRPSUMF ¶ 31; DSF ¶ 249; PRDSF ¶ 249.)

On November 23, 2020, Defendant held an eligibility meeting for S.R.'s disability status under N.J.A.C. 6A:14-3.5 or 3.6. (ALJ Op. 3; PSUMF ¶¶ 50-52; *see also* DSF ¶¶ 10, 322.) On November 24, 2020, it was determined that S.R. no longer had a disability that affected his educational performance, and therefore, S.R. no longer required an IEP or other special education services. (ALJ Op. 3; *see also* PSUMF ¶ 52; DMF ¶ 10.) Shortly thereafter, in December 2020, Plaintiffs filed a petition for due process alleging violations of IDEA, Section 504 of the Rehabilitation Act ("Section 504"), the Americans with Disabilities Act ("ADA"), and the New Jersey Law Against Discrimination ("NJLAD"). (DSF ¶ 2; PRDSF ¶ 2.) Defendant timely answered, denying any violation of S.R.'s rights. (DSF ¶ 3; PRDSF ¶ 3.) Plaintiffs' petition eventually proceeded to a hearing, which took place in front of an ALJ on several dates between

June 14 and September 23, 2021. (DSF ¶ 5; PRDSF ¶ 5.) The record was closed on January 14, 2022, and the ALJ issued a decision on February 28, 2022. (ALJ Op. 1-2.)

### C.      The ALJ's Decision

The ALJ found in favor of Defendant. (*Id.* at 30.) The ALJ noted testimony from four witnesses: Farber, Maryann McMahon-Nester ("McMahon-Nester"), and Allison McMullen ("McMullen") for Defendant, and Marcie Fountaine ("Fountaine") for Plaintiffs.[2] (*Id.* at 19.) The ALJ credited and outlined the below testimony by these witnesses.[3]

### *i.      Farber Testimony*

Farber worked for Defendant for sixteen years, and was a certified teacher of the handicapped, a certified elementary education teacher, and a certified learning disabilities teacher consultant ("LDTC"). (*Id.* at 3-4; Due Process Hr'g Tr. (Day 1) 33:10-34:13, ECF No. 16-1.) Farber is experienced planning IEPs and making initial eligibility determinations and has a master's degree in special education. (ALJ Op. 4; Due Process Hr'g Tr. (Day 1) 36:7-13.) Farber was accepted as an expert in special education and elementary education and special education classification. (ALJ Op. 4; Due Process Hr'g Tr. (Day 1) 43:3-7.)

Farber testified that she knew S.R. personally and observed him in class both in person and remotely. (ALJ Op. 4-5; Due Process Hr'g Tr. (Day 2) 17:22-24, 108:1-12, ECF No. 16-2.) Farber believed that S.R. was progressing between 2019 and 2020, such that a general education class was the appropriate setting for him. (*See* ALJ Op. 4; Due Process Hr'g Tr. (Day 1) 53:20-54:8.) Farber testified that S.R. met all of his goals and objectives while in kindergarten and that the

---

[2] Samantha Tognela also testified for Plaintiffs, but for the narrow purpose of establishing that the requirements of the IDEA were not suspended during the pandemic. (ALJ Op. 18.)

[3] For purposes of this section, the Court recites the below testimony only as the ALJ presented it in his Opinion.

modifications that S.R. needed moving forward were available to any student in his general education class, with or without an IEP. (ALJ Op. 4-5; Due Process Hr'g Tr. (Day 1) 62:2-63:2, 74:22-25.) When the time came for S.R.'s reevaluation, Farber testified that she reviewed S.R.'s Educational Evaluation and Social Emotional Update. (ALJ Op. 5; *see* Due Process Hr'g Tr. (Day 1) 78:10-24, 85:10-21, 86:7-16.) After consideration of her own observations, S.R.'s teachers' statements, and all relevant testing, Farber concluded that notwithstanding Plaintiffs' concerns with S.R.'s behavior at home, S.R.'s daily functioning and performance in school were appropriate without any special education supports. (ALJ Op. 5-7; *see also* Ex. 7 to AR *38-52; Due Process Hr'g Tr. (Day 1) 59:7-25.) Farber acknowledged the 51-point discrepancy between S.R.'s IQ and ECAD scores but testified that low scores on the ECAD do not conclusively establish a learning disability. (ALJ Op. 10; *see* Due Process Hr'g Tr. (Day 2) 116:6-117:2.) Instead, Farber testified, one must consider all factors of a student's daily functioning and whether actual educational performance was negatively impacted. (ALJ Op. 10; Due Process Hr'g Tr. (Day 2) 151:4-18.)[4] Farber maintained that there was no data to suggest that S.R.'s ADHD was having an adverse impact on his education by November 2020. (ALJ Op. 8; Due Process Hr'g Tr. (Day 2) 111:14-25.)

     *ii.    McMahon-Nester Testimony*

McMahon-Nester worked as a general education teacher for Defendant for thirty-three years. (ALJ Op. 10; Due Process Hr'g Tr. (Day 3) 7:3-25, ECF No. 16-3.) She was qualified as an expert in elementary education and reading instruction. (ALJ Op. 10; Due Process Hr'g Tr. (Day

---

[4] The ALJ additionally notes that evidence from the November 23, 2020 IEP meeting suggested "S.R. was not physically or verbally aggressive in the classroom[,] S.R. was in the average range with internalizing problems based on his anxiety and depression, and . . . Parental reporting did not [mesh] with what was observed in school." (ALJ Op. 6-7.)

3) 10:6-18.) McMahon-Nester testified that she assessed S.R. for letter and sound identification, phonemic awareness, rhyming, and syllables, which she did for all kindergarteners. (ALJ Op. 10; Due Process Hr'g Tr. (Day 3) 11:6-16.) She noted that S.R. qualified for supplemental reading instruction, as did six other students in the seventeen-student class.[5] (ALJ Op. 10; Due Process Hr'g Tr. (Day 3) 11:4-12, 12:19-13:17.)

Outside of S.R.'s need for additional reading development, McMahon-Nester testified that there were no behaviors that impeded S.R.'s learning during supplemental instruction, although he had to be muted at times to gather himself back together. (ALJ Op. 11; Due Process Hr'g Tr. (Day 3) 26:5-13.) McMahon-Nester further testified, however, that it was common for her students to require adult assistance to remain focused and that none of S.R.'s behaviors were out of the ordinary. (ALJ Op. 11; Due Process Hr'g Tr. (Day 3) 26:21-27:9.) Furthermore, McMahon-Nester testified that S.R. made significant progress in Kindergarten Phonemic Awareness and she did not believe S.R. needed an IEP because he made meaningful progress with McMahon-Nester and in his general education class throughout the year during the pandemic. (ALJ Op. 11; Due Process Hr'g Tr. (Day 3) 27:12-33:10, 47:24-48:9.)

---

[5] The ALJ in his Opinion notes that McMahon-Nester testified that at least six students in her class qualified for supplemental reading instruction. (ALJ Op. 10.) This assertion is supported by McMahon-Nester's testimony. (Due Process Hr'g Tr. (Day 3) 12:5-13:16.) Plaintiffs state that the ALJ's assertion that at least six students qualified for supplemental reading instruction was incorrect, and instead only four students qualified. (Pls.' Moving Br. 25 n.25 (citing Due Process Hr'g Tr. (Day 3) 23:10-16), ECF No. 9.) Plaintiffs' contention is misguided. The ALJ's assertion was a correct interpretation of McMahon-Nester's testimony, and the testimony that Plaintiffs cite does not speak to how many students *qualified* for supplemental reading instruction. (*See* Due Process Hr'g Tr. (Day 3) 22:21-23:9.) In fact, on the same page of the transcript that Plaintiffs cite to support their argument, McMahon-Nester clarifies that not all qualifying students' parents opt to send their child to supplemental reading instruction. (*Id.*) As such, the ALJ correctly noted that at least six students qualified for supplemental instruction.

### iii.   McMullen Testimony

McMullen worked for Defendant as a teacher for three years, and for a separate school for two years as a kindergarten teacher. (ALJ Op. 11; Due Process Hr'g Tr. (Day 3) 84:22-85:18.) She has a master's degree in teaching, and certification in elementary education, including reading instruction. (ALJ Op. 11; Due Process Hr'g Tr. (Day 3) 87:17-88:14.) The ALJ notes that McMullen was qualified as an expert in elementary education. (ALJ Op. 11; Due Process Hr'g Tr. (Day 3) 88:15-18.) In August 2020, before S.R. started in her class, McMullen met with his case managers to discuss his IEP goals and objectives. (ALJ Op. 11; Due Process Hr'g Tr. (Day 3) 89:2-17.) McMullen testified that while S.R. had difficulty waiting his turn and staying on topic, he met all other objectives in his IEP, and by November 2020 was making the level of progress that would be expected for a child his age at that point of the school year. (ALJ Op. 12; Due Process Hr'g Tr. (Day 3) 101:5-17, 182:7-183:11.)

McMullen testified that S.R. was proficient in math and showed progress throughout the school year in his general education kindergarten curriculum. (ALJ Op. 12: Due Process Hr'g Tr. (Day 3) 104:1-21.) She also noted that S.R.'s writing samples were appropriate and showed signs of progress. (ALJ Op. 12; Due Process Hr'g Tr. (Day 3) 106:14-21.)) Furthermore, McMullen testified that S.R.'s performance was in the "middle of the students" in his general education class, and as such, he did not need additional support. (ALJ Op.12; Due Process Hr'g Tr. (Day 3) 112:12-113:19.) McMullen concluded by noting S.R.'s continued improvement between October 2020 and January 2021, citing assessment data that was typical compared to the rest of the students in the class. (ALJ Op. 12-13; Due Process Hr'g Tr. (Day 3) 121:18-122:10.) McMullen could not speak to whether S.R.'s ADHD or other disabilities affected his ability to learn, only to the fact that he progressed throughout the year and began paying more attention as the year went on. (ALJ Op. 13; *see* Due Process Hr'g Tr. (Day 3) 186:3-188:18.)

iv.    *Fountaine Testimony*

Fountaine was accepted by the ALJ as an expert in speech and language pathology, but not as an expert in the field of special education. (ALJ Op. 13; Due Process Hr'g Tr. (Day 4) 58:24-25, ECF No. 16-4.) Fountaine was the co-owner and clinical director at the Princeton Center and was licensed in both New Jersey and New York as a speech and language pathologist. (ALJ Op. 13; Due Process Hr'g Tr. (Day 4) 5:12-17, 27:16-25.) She also holds a New York teaching certificate in speech and language disabilities. (ALJ Op. 13; Due Process Hr'g Tr. (Day 4) 27:22-25.)

Fountaine was approved by Defendant to evaluate students for reading disorders and to make recommendations. (ALJ Op. 14; Due Process Hr'g Tr. (Day 4) 11:24-12:8.) In March 2021, after this litigation began, Fountaine administered an independent speech-language evaluation to S.R. (ALJ Op. 14; *see* Due Process Hr'g Tr. (Day 4) 45:6-24.) Plaintiffs brought Fountaine in to evaluate S.R. because they were concerned that Defendant declassified S.R. despite significant reading, writing, and speech challenges. (ALJ Op. 14; *see* Due Process Hr'g Tr. (Day 4) 7:14-9:3, 95:4-13.) Fountaine considered S.R.'s developmental history, previous evaluations and educational data, assessments, progress notes, and reports cards. (ALJ Op. 14; Due Process Hr'g Tr. (Day 5) 29:6-8, ECF No. 16-5.)

After review of relevant materials, Fountaine determined that S.R.'s performance, based on his 2019-20 report cards and his May 2020 IEP, raised concerns from a speech and language perspective. (ALJ Op. 14; *see* Due Process Hr'g Tr. (Day 4) 70:4-11.) Fountaine testified that if she was on the IEP team, she would have wanted to see an updated educational, speech and language, and psychological evaluation, and to know more about S.R.'s phonological awareness prior to him entering kindergarten. (ALJ Op. 14-15; *see* Due Process Hr'g Tr. (Day 4) 70:4-19.) Fountaine was particularly concerned about S.R.'s phonological awareness, noting the discrepancy between S.R.'s IQ and ECAD testing. (ALJ Op. 15; *see generally* Due Process Hr'g Tr. (Day 4).)

Fountaine was also critical of the "Fountas & Pinnell" test Defendant used to assess S.R.'s phonological-awareness skills, which included the use of pictures, as opposed to verbal information which more accurately assesses phonological awareness.[6] (ALJ Op. 15; Due Process Hr'g Tr. (Day 4) 106:16-107:18.) In Fountaine's opinion, Defendant never actually assessed S.R.'s true phonological awareness. (*See id.*)

When Fountaine administered an independent phonological-awareness test, she concluded that S.R.'s phonological-awareness was below average. (ALJ Op. 15; *see* Due Process Hr'g Tr. (Day 4) 111:4-112:2) She testified that considering S.R.'s IQ and below average readings skills, S.R.'s early reading skills were not developing as they should for his age and capacity to learn. (ALJ Op. 15; *see* Due Process Hr'g Tr. (Day 4) 137:22-138:9.) Fountaine's testing confirmed Defendant's finding of a 51-point discrepancy between S.R.'s IQ and ECAD scores. (ALJ Op. 15; *see* Due Process Hr'g Tr. (Day 4) 113:22-114:2.)

After Fountaine concluded her testing, she recommended "structured literacy intervention," as opposed to a "balanced literacy approach" because the latter approach does not meet the needs of a student with S.R.'s profile. (ALJ Op. 16; *see* Due Process Hr'g Tr. (Day 5) 21:3-22:13.) Fountaine also diagnosed S.R. with a phonological-awareness disorder. (ALJ Op. 16; *see* Due Process Hr'g Tr. (Day 4) 114:8-11.) Fountaine made these conclusions without communicating with S.R.'s teachers or case managers and testified that she did not feel it was necessary to communicate with S.R.'s teachers or case managers in rendering her assessments because her assessments were consistent with the documentation she was provided. (ALJ Op. 17; *see* Due Process Hr'g Tr. (Day 5) 16:7-16.)

---

[6] Plaintiffs and Fountaine appear concerned that S.R. may have dyslexia, even though it does not appear S.R. has been diagnosed with the disorder. (*See* Pls.' Moving Br. 14 n. 18, ECF No. 9; ALJ Op. 9, 20, 25.)

v.     *Credibility Determinations*

After consideration of the above testimony and evidence, the ALJ made his credibility findings. (ALJ Op. 18.) He found Farber to be a "calm, credible witness who appeared knowledgeable and experienced." (*Id.* at 19.) He also found that she "displayed no particular bias towards [Defendant]." (*Id.*) As to McMahon-Nester, he found she "exhibited great experience in her field and offered unbiased, knowledgeable testimony." (*Id.*) The ALJ "found her testimony to be credible." (*Id.*) The ALJ also found that McMullen "displayed an excellent ability to explain her assessments in a credible manner without exposing any inherent bias towards her employer." (*Id.*)

On the other hand, the ALJ "did not find Fountaine's testimony to be as credible as that of [Defendant's] expert witnesses." (*Id.* at 20.) This was particularly so because Fountaine "was never on an IEP team," "she had never been a public-school teacher," "she did not perform any classroom observation," and "she did not have any special education degrees or certifications." (*Id.*) The ALJ also found that Fountaine was "not always clear and not always responsive to [Plaintiffs' counsel's] direct examination," testifying about "topics not addressed in her report." (*Id.*) Furthermore, Fountaine "testified that standardized tests were the key to her analysis, yet those tests did not identify a learning disability, despite the conclusions she stated." (*Id.*) Finally, the ALJ noted that Fountaine did not "mention in her report [the] social/emotional update" on S.R. from October 2020, claiming such omission was an "oversight." (*Id.*)

vi.     *ALJ's Legal Conclusions*

Finally, the ALJ made his legal findings and conclusions. The ALJ found, by a preponderance of the evidence, that Defendant substantially complied with all statutory and regulatory requirements when it determined that S.R. was no longer eligible for special education. (*Id.* at 23, 27.) Furthermore, the ALJ found that Defendant met its burden of proving that it

11

provided a FAPE while "S.R. was receiving services pursuant to IEPs for the 2019-2020 and 2020-2021 school years." (*Id.*) In substantiating these legal findings, the ALJ noted the credibility of Defendant's evidence, that the 51-point discrepancy between S.R.'s IQ and ECAD does not automatically qualify him for special education, and that the evidence does not appear to show that S.R.'s educational performance suffered outside of his IEP. (*See id.* 23-25.) The ALJ also found that Plaintiffs "failed to establish that the education provided to S.R. during the Covid-19 pandemic . . . resulted in the deprivation of an education," and in fact, the evidence suggests that "S.R. made a great deal of progress during those time periods." (*Id.* at 29.)

Following the ALJ's decision, Plaintiffs filed a Complaint in this Court. (ECF No. 1.) Plaintiffs bring three counts: (1) violation of IDEA, 20 U.S.C. § 1400, *et seq.*; (2) violation of Section 504, 29 U.S.C. § 794; and (3) violations of Title II of the ADA, 42 U.S.C. § 12132 and the NJLAD, N.J. Stat. Ann. § 10:1-2.[7] Defendant answered, and because the parties did not intend to bring new evidence before the Court, the parties filed the instant Summary Judgment motions.

## II.   **LEGAL STANDARD**

"Where no new evidence has been presented to the Court, motions for summary judgment in an IDEA case are the procedural vehicle for asking the judge to decide the case based on the administrative record." *K.H. ex rel. B. Y. v. N. Hunterdon-Voorhees Reg'l High Sch.*, No. 05-4925, 2006 WL 2331106, at *4 (D.N.J. Aug. 10, 2006). "The standard of review under which this Court considers an appeal of a[n ALJ's] decision under the IDEA differs from that governing the typical review of summary judgment." *G.A. ex rel. M.A. v. Voorhees Twp. Bd. of Educ.*, 202 F. Supp. 2d 345, 359 (D.N.J. 2002), *aff'd*, 65 F. App'x 404 (3d Cir. 2003) (internal quotation marks and citation

---

[7] Plaintiffs bring their ADA claim and NJLAD claim collectively because they allege "[c]ourts interpret the NJLAD in accordance with the ADA." (Compl. ¶ 83, ECF No. 1.)

omitted). The parties' motions, therefore, "[a]lthough framed as . . . motion[s] for summary judgment, . . . [are] actually . . . appeal[s] of the ALJ's ruling" and the Court will "essentially conduct[ ] a bench trial based on a stipulated record." *G.S. v. Cranbury Twp. Bd. of Educ.*, No. 10-774, 2011 WL 1584321, at \*8 (D.N.J. Apr. 26, 2011); *M.S. v. Mullica Twp. Bd. of Educ.*, 485 F. Supp. 2d 555, 566 (D.N.J. 2007).

"When deciding an IDEA case, the District Court applies a modified version of *de novo* review and is required to give due weight to the factual findings of the ALJ." *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 389 (3d Cir. 2006). "Factual findings from the administrative proceedings are to be considered prima facie correct, and if the reviewing court does not adhere to those findings, it is obliged to explain why." *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 563 (3d Cir. 2010) (internal quotation marks omitted) (citing *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 734 (3d Cir. 2009)). "Moreover, the reviewing court must accept the ALJ's credibility determinations and 'may disturb them only upon a finding that non–testimonial extrinsic evidence justifies a contrary conclusion.'" *E.P. v. N. Arlington Bd. of Educ.*, No. 17-08195, 2019 WL 1495692, at \*4 (D.N.J. Apr. 1, 2019) (quoting *C.S. v. Montclair Bd. of Educ.*, No. 16-3294, 2017 WL 4122433, at \*5 (D.N.J. Sept. 18, 2017)). An ALJ's legal determinations, on the other hand, are reviewed de novo. *Moorestown Twp. Bd. of Educ. v. S.D.*, 811 F. Supp. 2d 1057, 1064 (D.N.J. 2011). "Applying these standards, the district court may make findings 'based on the preponderance of the evidence and grant the relief it deems appropriate, including an award of attorney's fees, a requirement for reimbursement for a private educational placement, and a direction for the provision of a compensatory education.'" *Id.* (quoting *Bayonne*, 602 F.3d at 564).

## III.   **DISCUSSION**

After consideration of the administrative record and the parties' arguments, the Court grants Defendant's Motion for Summary Judgment. The Court finds that the ALJ correctly concluded that Defendant did not violate the IDEA when deciding to declassify S.R., and therefore, Defendant did not violate Section 504, the ADA, or the NJLAD.

### A.      **Count One: Violation of IDEA**

"The IDEA and implementing regulations set forth procedures school districts should follow to identify and evaluate children with disabilities." *J.M.*, 2020 WL 6281719, at *6 (citing *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 250 (3d Cir. 2012)). New Jersey's implementation of the IDEA sets forth a three-part test to determine whether a student is eligible for special education services: (1) whether the student has one of 14 enumerated disabilities, one of which is emotionally disturbed; (2) whether the disability adversely affects the student's educational performance; and (3) whether the student is in need of special education and related services. *M.S. v. Randolph Bd. of Educ.*, No. 18-13029, 2019 WL 4785742, at *8 (D.N.J. Sept. 30, 2019) (citing N.J.A.C. 6A:14-3.5 (c)). All three prongs must be satisfied for a student to be eligible for services under the IDEA. (*Id.*)

Plaintiffs contend that the ALJ did not base his decision on "all credible, objective evidence," which Plaintiffs maintain clearly showed S.R. required further special education services. (Pls.' Moving Br. 1.) Instead, Plaintiffs maintain that the ALJ elevated Defendant's witnesses' testimonial opinions over what Plaintiff classifies as the "objective, data-driven opinions" of Fountaine. (*Id.* at 2.) Plaintiffs also contend that Defendant committed several substantive and procedural errors under the IDEA that effectively deprived S.R. of a FAPE for the 2020-2021 school year. (*Id.* at 4-15.)

Defendant opposes and contends that a discrepancy between S.R.'s IQ and ECAD does not compel Defendant to classify S.R. as disabled. (Def.'s Opp'n Br. 1-6, ECF No. 11.) Defendant contends that the ALJ correctly concluded that S.R. did not have a disability that adversely affected his educational performance because no evidence in the record, even when considering Fountaine's testimony, establishes that S.R.'s educational performance was adversely affected by a disability. (Def.'s Moving Br. 5-7, ECF No. 8-3.)

As an initial matter, and as Third Circuit precedent dictates, this Court accepts the ALJ's factual findings as prima facie true and will not disturb the ALJ's credibility determinations unless Plaintiffs introduce non-testimonial extrinsic evidence convincing the Court to do so. *See D.S.*, 602 F.3d at 563-64. While Plaintiffs challenge the ALJ's factual and credibility findings generally, there is no evidence that the ALJ credited expert testimony that was, as Plaintiffs contend, "mere conclusion[s]" or that the ALJ disregarded Plaintiff's "data-driven" evidence in rendering his decision. (Pls.' Moving Br. 3; *but see, e.g.*, ALJ Op. 24-25 (crediting testimony and evidence from Defendant's experts that "[d]espite [S.R.'s] reading scores being below average . . . [S.R.'s] ECAD subtests demonstrated that S.R. did not have a learning disability or communication impairment; rather [the experts] asserted[, S.R.'s] overall score was negatively affected by his letter-word identification, and indicated that [Defendant] had general education interventions available to addresses such deficiencies" while acknowledging Fountaine's testimony to the contrary). Moreover, Plaintiffs cite to no law supporting their contention that the ALJ erred as a matter of law by crediting testimonial evidence over objective, data-driven evidence in rendering his decision. (*See generally* Pls.' Moving Br.) Instead, the Court notes, the ALJ credited both sets of evidence by expressly weighing the data-driven evidence against the testimonial evidence before rendering his decision. (Pls.' Moving Br. 3-5; *see, e.g.*, ALJ Op. 9-10, 12-15, 16, 21-22.)

Instead, Plaintiffs appear only to disagree with the ALJ's decision to credit Defendant's testimony and interpretation of data pertaining to S.R.'s learning capacities over Plaintiffs' arguments and data-interpretation. Such general disagreement does not persuade the Court to abandon the ALJ's credibility or factual determinations. As such, the Court rejects Plaintiffs' contention that the ALJ's factual or credibility findings were clearly erroneous, and thus, the Court will not disturb those findings unless the record otherwise compels the Court to do so.

   i.    *IDEA Eligibility*

Defendant's Motion for Summary Judgment is granted because the ALJ correctly found that the evidence in the record does not show, by a preponderance of the evidence, that S.R. had a disability "that adversely affected his educational performance." (ALJ Op. 27; *see also M.S.*, 2019 WL 4785742, at *8 (finding "New Jersey's implementation of the IDEA sets forth a three-part test to determine whether a student is eligible for special education services'" including "whether the disability adversely affects the student's educational performance" and all three prongs must be satisfied for a student to be eligible for services under the IDEA).)

There is ample evidence in the record to support a conclusion that S.R. was progressing in school and was no longer in need of an IEP. (*See* ALJ Op. 20-21 (concluding, in part, that the evidence presented showed that although S.R. experienced social and emotional delays, "he had made good progress through the school year and performed well in class[,] S.R. would thrive in a general education class with monitoring[, and] S.R. had made meaningful, age-appropriate educational progress for a five-year-old"); *see, e.g.*, Due Process Hr'g Tr. (Day 1) 44:2-14, 55:2-16, 56:11-25, 57:4-10, 64:9-66:2, 78:18-24; Due Process Hr'g Tr. (Day 3) 164:18-166:25; Ex. 7 to AR *40, 42.) Of particular importance, the ALJ credited the testimony of Farber, McMahon-Nester, and McMullen, all qualified as experts in special education and/or elementary education, who testified from personal experience with S.R. that he no longer needs an IEP to

16

perform in a general education class. (ALJ Op. 4, 10-12; Due Process Hr'g Tr. (Day 1) 53:20-54:8;
Due Process Hr'g Tr. (Day 3) 27:12-33:10, 47:24-48:9, 112:12-113:19.) Moreover, as the ALJ
noted, Defendant's witnesses testified that S.R. "made significant progress in Kindergarten
Phonemic Awareness," was proficient in math, showed progress throughout the year with the
general education kindergarten curriculum, and showed that his performance was on par with the
other students in his general education class. (ALJ Op. at 10-12.)

While McMahon-Nester testified that S.R. required specialized help with his reading, so
too did more than a third of S.R.'s seventeen-student general education class. (*Id.* at 10; Due
Process Hr'g Tr. (Day 3) 11:4-12:11, 12:19-13:16.) McMahon-Nester also noted that S.R.'s
attention could wane, but such behavior was not atypical for kids S.R.'s age, and McMullen
testified that S.R. began paying more attention as the year went on. (ALJ Op. 11, 13; Due Process
Hr'g Tr. (Day 3) 187:13-188:11; *see also D.K.*, 696 F.3d at 251 (noting "hyperactivity, difficulty
following instructions, and tantrums are not atypical during early primary school years" (citation
omitted).) Moreover, Plaintiffs offered only the documentary assessments of their expert Fountaine
to rebut the testimony of McMahon-Nester and the other Defendant witnesses about S.R.'s
educational performance, which the ALJ found less credible due in large part to Fountaine's
disconnectedness from S.R.'s in-class progress over the period of several years. (ALJ Op. 13,
19-20.)

While the Court notes that Fountaine expressed particular concern about the 51-point
discrepancy between S.R.'s IQ and ECAD testing, that 51-point discrepancy in S.R.'s testing does
not alone establish a disability and does not speak to S.R.'s educational performance, but rather,
speaks to whether S.R. may have a learning disability more generally. (*Id.* at 25; *J.M. v. Summit
City Bd. of Educ.*, 39 F.4th 126, 140-41 (3d Cir. 2022) (noting that a specific learning disability

can be identified by the "severe-discrepancy approach" which judges a student's "current achievement and intellectual ability in one or more [areas of academic aptitude]" but also articulating that such approach "establishes only that the child has a specific learning disability," not whether the student needs "special education and related services"). After review of the record and briefing in this matter, it is evident that essentially all of Fountaine's testimony and Plaintiffs' arguments on summary judgment are directed towards whether or not S.R. has or had a disability.[8] (*See generally* ALJ Op.; Pls.' Moving Br.) The only evidence introduced by Plaintiffs that can arguably be inferred as evidence that S.R.'s educational performance is suffering as a result of his disability is Fountaine's conclusion that S.R.'s report cards showed "below average" reading skills. (*See* ALJ Op. 10-13, 16.) This conclusion, even if true, does not necessarily lead the Court to conclude that S.R.'s educational performance is suffering as a result of any disability nor does it outweigh the great weight of evidence suggesting S.R.'s reading skills are improving, and that he is performing well in the general education setting. (*See id.*)[9]

For these reasons, the ALJ did not err in concluding that "by a preponderance of the evidence . . . S.R. did not have a disability that adversely affected his educational performance." (*Id.* at 27.) As such, the Court affirms the ALJ's ruling that Defendant complied with the IDEA when determining S.R. was not eligible for a FAPE.

---

[8] The Court also notes that Fountaine's report is noticeably dependent on S.R.'s parents' assessments of S.R.'s behavior and academic performance. (Ex. 6 to AR *10, 19, 21, 22, 24-26.) Fountaine pays less attention in her report to any objective academic performance indicia like S.R.'s grades or in-class performance. (*See generally id.*)

[9] The Court notes, as the ALJ did, that "if in the future S.R.'s educational performance merited further evaluation, he would be referred to the child[-]study team for re-evaluation." (ALJ Op. 25.) As such, S.R. is not foreclosed indefinitely from receiving an IEP.

ii.     *Procedural and Substantive Denial-of-FAPE under IDEA*

Plaintiffs also argue that Defendant committed procedural and substantive violations of the

IDEA by declassifying S.R. and depriving him of a FAPE for the 2020-2021 school year. (Pls.'

Moving Br. 28.) "[T]he Supreme Court has directed that a school district's liability for violations

of the IDEA is a two-fold inquiry: (1) [h]as the school district complied with the procedures set

forth in IDEA[]; and (2) [h]as the school district fulfilled its obligation to provide the student with

a FAPE?" *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 66 (3d Cir. 2010) (quoting *Bd. of Educ.*

*of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206-07 (1982)).

### a.     **Procedural Denial of a FAPE**

Plaintiffs contend that Defendant committed five procedural violations: (1) Defendant

failed to revise S.R.'s IEP in May 2020; (2) Defendant failed to perform a timely reevaluation of

S.R. before he entered kindergarten; (3) Defendant failed to evaluate S.R. in all areas of suspected

disability; (4) Defendant failed to monitor S.R.'s behavioral progress and gather sufficient

behavioral data during the 2019-2020 school year; and (5) Defendant predetermined that S.R.

would be declassified. (Pls.' Moving Br. 28.) "In some cases, a procedural violation may rise to

the level of a denial of a FAPE, entitling the plaintiff to compensatory education or tuition

reimbursement." *C.H.*, 606 F.3d at 66. A procedural violation of the IDEA, however, "is not a per

se denial of a FAPE; rather, a school district's failure to comply with the procedural requirements

of the Act will constitute a denial of a FAPE only if such violation causes substantive harm to the

child or his parents." *Id.* (alteration in original) (collecting cases).

> Under the implementing regulations, substantive harm occurs only
> if the preponderance of the evidence indicates that[:]
>
> [T]he procedural inadequacies (i)[i]mpeded the child's right to a
> FAPE; (ii) significantly impeded the parent[s'] opportunity to
> participate in the decision-making process regarding the provision

of a FAPE to the parent's child; or (iii) caused a deprivation of the educational benefit.

*Id.* at 67.

None of Defendant's alleged procedural violations resulted in substantive harm to Plaintiffs. First, Plaintiffs contend Defendant failed to revise S.R.'s IEP in May 2020 despite acknowledging problematic ADHD behaviors, which Plaintiffs contend went unaddressed during the 2020-2021 school year. (*See* Pls.' Moving Br. 29-30.) Considering S.R.'s progress between May 2020 and his declassification in November 2020, however, this alleged procedural violation does not appear to have caused substantive harm to S.R. (*See* ALJ Op. 10-13.) To the contrary, the record suggests that S.R.'s May 2020 IEP helped reduce S.R.'s ADHD behaviors to such an extent that Defendant found S.R. was no longer in need of an IEP by November 2020. (*See id.* at 5, 10-13.)

Second, Plaintiffs contend that Defendant failed to conduct a timely reevaluation of S.R.'s disability status by June 30, 2020, instead waiting until November 2020 to reevaluate him. (Pls.' Moving Br. 30; *see also* N.J.A.C. 6A: 14-3.8(g).) Even if Defendant failed to adhere to procedural rules in waiting to evaluate S.R. until November 2020, such violation of the rules was harmless because S.R. received a FAPE until November 2020. (ALJ Op. 3.) Thus, S.R. certainly was not deprived of a FAPE by being granted additional FAPE (between June 2020 and November 2020) that otherwise may not have been available to him were he reevaluated and declassified in June 2020. (*Id.* at 20-22.)

Third, Plaintiffs contend that Defendant "failed to evaluate S.R. in all areas of his suspected disability" before declassifying him. (Pls.' Moving Br. 31.) To substantiate this claim, Plaintiffs highlight the 51-point disparity between S.R.'s IQ and ECAD and contend that, because of the score disparity, Defendant "should have assessed S.R.'s phonological awareness over the summer

of 2020, prior to kindergarten." (*Id.*) This issue has already been settled. The administrative record establishes that over the summer of 2020, S.R. was making significant progress and there was no indication that a disability was impacting his educational performance. (ALJ Op. 20-22.) As such, Defendant did not harm S.R. by failing to conduct additional phonological testing where the FAPE he received, as evidenced by the record, was effective in helping S.R. progress.

Fourth, Plaintiffs argue Defendant failed to monitor and gather adequate data on S.R.'s behaviors during the 2019-20 school year. (Pls.' Moving Br. 32.) Here, Plaintiffs primarily argue that Defendant failed to administer the BASC-3 to S.R.'s teachers, and thus, failed to obtain any rating of his behaviors in the school environment. (*Id.*) The administrative record does not support Plaintiffs' conclusions that S.R.'s behaviors were not evaluated in the school environment. (*See generally* ALJ Op.) To the contrary, two of S.R.'s teachers, McMahon-Nester and McMullen, testified, for example, that S.R.'s behaviors were improving and were not an atypical disruption to class. (*See id.* at 10-13; *see also D.K.*, 696 F.3d at 251 (noting "hyperactivity, difficulty following instructions, and tantrums are not atypical during early primary school years" (citation omitted).) Therefore, even if a BASC-3 was administered, the record suggests that S.R. still would have been declassified and would not have received a FAPE for the 2020-21 school year.

Fifth, and finally, Plaintiffs contend that Defendant "predetermined that S.R. would be declassified" and did not meaningfully include Plaintiffs in the decision-making process as to whether S.R. should be declassified. (Pls.' Moving Br. 29.) Plaintiffs contend that Farber "testified that at the end of the 2019-20 school year, the [IEP] team had already decided" that "S.R. would 'most likely' be determined ineligible for special education in 2020-21," notwithstanding parental input. (*See id.*) The sole case Plaintiffs cite to support their argument that parental input is necessary before declassification addresses a parent's involvement in the IEP crafting process *after*

a student qualifies for a FAPE under the IDEA. *See D.B. ex rel. H.B. v. Gloucester Twp. Sch. Dist.*, 751 F. Supp. 2d 764, 771 (D.N.J. 2010) ("Predetermination of an IEP can be grounds for finding a violation of the IDEA, in particular because predetermination can serve to exclude parents from meaningfully participating in the decision[-]making process."). Such process is not at issue here. Regardless, even assuming parental input is necessary in deciding whether a child is disabled, Defendant took Plaintiffs' BASC-3 assessments of S.R.'s at-home behaviors into account when deciding to declassify S.R. (PSUMF ¶ 115; DRPSUMF ¶ 115.) As such, any allegedly predetermined declassification of S.R. did not substantively harm Plaintiffs or S.R. where the record establishes that Plaintiffs input was taken into account in Defendant's decision to declassify S.R.

For these reasons, Plaintiffs' contentions that procedural violations of the IDEA deprived S.R. of a FAPE are rejected.

### b.    Substantive Denial of a FAPE

Plaintiffs next contend that S.R. was substantively deprived of a FAPE when Defendant denied S.R. an IEP with appropriate programming. (Pls.' Moving Br. 32.) In bringing this argument, Plaintiffs maintain that S.R.'s 2020-21 IEP was insufficient where he was not provided special education for his specific learning disability, namely, he was not provided a "structured literacy" program like Fountaine testified he required. (*Id.* at 32-33.) The gravamen of Plaintiffs' argument here is that Fountaine's "more credible" opinion that S.R.'s "early reading skills had not developed under [Defendant's] program, especially given his capacity to learn" mandates a conclusion that S.R. did not receive a FAPE, entitling him to compensatory education. (*Id.* at 34.)

As stated previously, under the IDEA, school districts must work with parents to design an IEP. *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 269 (3d Cir. 2012) (citing 20 U.S.C. §§ 1412(a)(4), 1414(d)). An "IEP must include an assessment of the child's current educational performance,

must articulate measurable educational goals, and must specify the nature of the special services that the school will provide." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005) (citing 20 U.S.C. § 1414 (d)(1)(A)). Although it must provide students with a "basic floor of opportunity," the IEP "does not have to provide 'the optimal level of services,' or incorporate every program requested by the child's parents." *Ridley*, 680 F.3d at 269 (quoting *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 557 (3d Cir. 2010)). Rather, an IEP must, at a minimum, "be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential" and individual abilities. *Id.* (internal quotation marks and citations omitted); *see also E.P.*, 2019 WL 1495692, at *2 (making clear that this longstanding formulation in the Third Circuit remains intact after the Supreme Court's ruling in *Endrew F.* that the "IDEA 'requires an education program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances'" (quoting *Endrew F.*, 580 U.S. at 403)).

Importantly, Plaintiffs concede that S.R. advanced from "Level A to Level C [on the Fountas & Pinnell test] during the 2020-21 school year." (Pls.' Moving Br. 35.) Even if the Fountas & Pinnell test is inferior to Fountaine's suggested "structured literacy" program, Defendant was not obligated to provide an "optimal level of services," but rather, a program "reasonably calculated to enable [S.R.] to receive meaningful educational benefits in light of [his] intellectual potential" and individual abilities. *Ridley*, 680 F.3d at 269. Certainly, an improvement on the Fountas & Pinnell test qualifies as a meaningful educational benefit, even if it is not the optimal benefit S.R. could have received.

As already discussed extensively in this Opinion, the weight of the evidence simply does not support Plaintiffs' conclusions that S.R. was not benefitting from his IEP. This Court credits the ALJ's reasoning in his Opinion where he noted:

> [Defendant] believed not only that it had offered [S.R.] an appropriate education pursuant to its IEP, but that S.R. had in fact met the goals set out in the IEP, and was doing well, showing progress, and performing on a level akin to his classroom peers. [Defendant] reviewed and evaluated testing results and took into consideration S.R.'s teachers' opinions in finding that S.R. was making progress, and more than simply de minimis progress.

(ALJ Op. 28.) Again, Plaintiffs' contentions here primarily hinge on which expert's opinion to trust: Fountaine's that a structured literacy program was necessary for S.R.'s SLD to be addressed, or Farber, McMahon-Nester, and McMullen's opinions that S.R. was making significant progress in class, suggesting his previous IEP was successful and that S.R. no longer required an IEP. The ALJ credited Defendants' witnesses over Fountaine, and as noted earlier, no extrinsic evidence in the record convinces the Court that the ALJ's credibility determinations should be disregarded. Even if the Court chose to challenge the ALJ's credibility determinations anew here, the evidence on the record, cumulatively, leads inescapably to the conclusion that S.R.'s previous IEP led to a meaningful educational benefit.

For these reasons, while the Court recognizes that S.R. may not have gotten an optimal IEP for his SLD, it cannot conclude that S.R. was substantively deprived of a FAPE where he made notable progress in school and the record suggests he was progressing alongside his general education classmates. Accordingly, the ALJ's findings are affirmed, and Defendant's Motion for Summary Judgment on Count One, Plaintiff's denial-of-FAPE claim under the IDEA, is granted.

### B.      Counts Two and Three: Section 504, ADA, and NJLAD[10]

Plaintiffs contend generally that Defendant violated Section 504, the ADA, and the NJLAD

by depriving S.R. of meaningful access to his education. (*See id.* at 36-37.) Defendant contends

that "[t]he failure of Plaintiffs' IDEA appeal at Count One is fatal to Plaintiffs' Section 504,

ADA[,] and [NJ]LAD claims at Counts Two and Three." (Def.'s Opp'n Br. 4.) The Court agrees

with Defendant.

To prevail under Section 504, the ADA, and the NJLAD, a plaintiff must demonstrate that

S.R. "(1) has a disability; (2) was otherwise qualified to participate in a school program; and

(3) was denied the benefits of the program or was otherwise subject to discrimination because of

[his] disability." *Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176,

189 (3d Cir. 2009) (citations omitted). Importantly, "a plaintiff cannot succeed on a discrimination

claim "'simply by proving (1) that [he] was denied some service and (2) [he] is disabled. [Instead,

t]he [school] must have failed to provide the service for the sole reason that the child is disabled."

*D.M. ex rel. Mr. J.M. v. East Allegheny Sch. Dist.*, 2022 WL 4608672, at *4 (W.D. Pa. Sept. 30,

2022) (quoting *K.J. v. Greater Egg Harbor Reg'l High Sch.*, 431 F. Supp. 3d 488, 501 (D.N.J.

2019) (citing Third Circuit precedent).

The record does not support a finding that Defendant denied S.R. a FAPE because he was

disabled. Conversely, the record supports the conclusion that S.R. did not receive a FAPE or

accompanying IEP because he was deemed to no longer be disabled. (*See generally* ALJ Op.) To

---

[10] In the context of lawsuits considering the education of children with disabilities, the same standards apply to Section 504, ADA, and NJLAD claims. *Chisolm v. McManimon*, 275 F.3d 315, 324 n.9 (3d Cir. 2001); *see also Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009) ("[T]he same standards govern both [Section 504] and ADA claims."). *Weiss v. Rutgers Univ.*, No. 12-6834, 2014 WL 2608201, at *4 (D.N.J. June 10, 2014) ("New Jersey Courts . . . apply the standards developed under the ADA when analyzing NJLAD claims." (quoting *Mucci v. Rutgers*, No. 08-4806, 2011 WL 831967, at *21 (D.N.J. Mar. 3, 2011)).

the extent that Plaintiffs merely make Section 504, ADA, and NJLAD arguments analogous to their denial-of-FAPE claim under the IDEA (i.e., Defendant denied S.R. meaningful access to a FAPE by declassifying him and depriving him of a needed FAPE), such issue has already been decided in Defendant's favor. *See J.M.*, 39 F.4th at 147 (finding that "[d]epending on the factual basis for a denial-of-FAPE claim, the legal differences between the IDEA and § 504 may be of no moment" because where "parents do not succeed on their denial-of-FAPE claim, and they offer no additional evidence in support of their § 504 claim" other than the evidence presented to support their denial-of-FAPE claim, "the failure of the denial-of-FAPE claim . . . foreclose[s] the [§] 504 claim.) For these reasons, Defendant's Motion for Summary Judgment on Counts Two and Three is also granted.

## IV.    **CONCLUSION**

For the reasons stated above, Defendant's Motion for Summary Judgment is granted in its entirety. Accordingly, Plaintiffs' Motion for Summary Judgment is denied in its entirety. An Order will issue consistent with this Memorandum Opinion.



MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE